IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Justin Mackie, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Coconut Joe's IOP LLC., CJ Offering LLC., Joe Petro and Caitlin West, *individually,*<br><br>Defendants. | CIVIL ACTION NO: 2:20-cv-02562-DCN<br><br>COLLECTIVE ACTION COMPLAINT<br>(Jury Trial Requested) |

Plaintiff Justin Mackie, ("Plaintiff" or "Mr. Mackie") individually and on behalf of all others similarly situated, by way of his Complaint, brings the below claims against Defendants, Coconut Joe's IOP LLC ("Coconut Joe's"), CJ Offering LLC, Joe Petro ("Mr. Petro") and Caitlin West, ("Ms. West") (collectively "Defendants"):

## NATURE OF CLAIMS

1.   Plaintiff alleges his termination was in violation of the Families First Coronavirus Response Act, ("FFCRA") 2020 Enacted H.R. 6201, 116 Enacted H.R. 6201.

2.   Plaintiff also alleges the Defendants violated the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. §201, *et seq*, ("FLSA") and he brings this action as a collective action pursuant to 29 U.S.C. §216(b), individually and on behalf of other similarly situated employees who suffered damages.

## CLASS CLAIMS

1

3. Specifically, Plaintiff brings this suit on behalf of a class of similarly situated persons composed of:

*All current and former servers who have worked for Defendants during the statutory period, who were not paid the Federal Minimum wage of $7.25 an hour and were required to contribute a portion of their tips into a mandatory tip pool.*

## PARTIES, JURISDICTION AND VENUE

4. Plaintiff Justin Mackie is a citizen and a resident of Charleston County, South Carolina.

5. Defendant, Coconut Joe's IOP LLC., is a for-profit limited liability South Carolina Corporation, organized and existing under the laws of South Carolina, and is registered with the South Carolina Secretary of State.

6. Defendant, CJ Offering LLC., is a for-profit limited liability South Carolina Corporation, organized and existing under the laws of South Carolina, and is registered with the South Carolina Secretary of State.

7. Defendant, Joe Petro, is a citizen and resident of Berkeley County, South Carolina.

8. Defendant, Caitlin West, is a citizen and resident of Charleston County, South Carolina.

9. Venue is proper in this District because the Defendants have conducted substantial, continuous and systematic commercial activities in Charleston County. Additionally, the unlawful labor practices and policies giving rise to Plaintiff's claims were committed in the Charleston Division of this Court.

10. Plaintiff brings this action, individually and as an opt-in collective action pursuant to 29 U.S.C. § 216(b), on behalf of a class of all similarly situated servers who were not paid the

federal minimum wage, and had improper deductions from their wages and tips while working for Defendants.

11. This Court has jurisdiction of the Plaintiff's claims brought under the FLSA pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216 (b).

12. In addition, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 over Plaintiff's pendent claims, which are brought pursuant to the law of the State of South Carolina, because those claims arise out of the same transaction or occurrence as the federal claims alleged herein.

## FACTS

13. Mr. Petro has owned and operated the restaurant Coconut Joe's located at 1120 Ocean Blvd, Isle of Palms, SC 29451 Mr. Petro owned and operated the restaurant for twenty-three (23) years. Upon information and belief, on June 24, 2020, Mr. Petro sold the restaurant to Perry Freeman.

14. Ms. West is Mr. Petro's daughter. Upon information and belief, Ms. West had an ownership interest in the restaurant with her father. Ms. West was the General Manager ("GM") when the restaurant was owned by her father. After the sale, Ms. West has continued to work at the restaurant in a management capacity.

15. Upon information and belief, CJ Offering LLC., is owned by Mr. Petro and Ms. West. It is the limited liability corporation that operated the restaurant prior to the sale.

16. Upon information and belief, Coconut Joe's IOP LLC is a limited liability company that currently operates the restaurant and is owned by Perry Freeman.

17. Upon information and belief, the restaurant is still engaging in the same illegal policies and practices that are the subject of this lawsuit.

18. When Mr. Petro owned the restaurant, he controlled the finances and operations and regularly exercised the authority to hire and fire employees, determine the work schedules of employees, set the rate of pay of employees, and instituted the tip pool. If Mr. Petro did not directly create the tip pool policy, he hired the individuals to whom he delegated this authority; therefore, Mr. Petro is individually liable to Plaintiff.

19. When Ms. West regularly exercises the authority to hire and fire employees, determine the work schedules of employees, set the rate of pay of employees, and enforce the tip pool. If Ms. West did not directly create the tip pool policy, she hired the individuals to whom she delegated this authority, therefore, Ms. West is individually liable to Plaintiff.

20. By virtue of such control and authority, Mr. Petro and Ms. West employed Plaintiff and similarly situated employees as such terms are defined by the FLSA, and FFCRA.

21. The Defendants employed Mr. Mackie from July of 2016 to May of 2020.

22. Plaintiff performed various positions while he was employed at Coconut Joe's; however, he spent most of his time working as server.

23. Defendants paid Mr. Mackie an hourly rate of $4.00 per hour plus tips when he worked as a server.

24. His primary job responsibilities included taking customers' drink and food orders.

25. Plaintiff and other similarly situated servers had an employment agreement with Defendants that they would be paid consistent with all applicable laws, including federal and state wage and hour laws.

26. Plaintiff and similarly situated servers had an employment agreement with Defendants whereby they would be paid for all hours worked.

27.  Defendants paid Plaintiff, and other similarly situated servers, an hourly wage less than the statutory minimum wage by taking the "Tip Credit" under the FLSA, 29 U.S.C. § 203(m).

28.  Defendants had a policy that required Mr. Mackie and other similarly situated servers to remit a portion of their tips at the end of each shift into a mandatory tip pool.

29.  Defendants required Plaintiff and similarly situated servers to put 3% of all their food and alcohol sales into a tip pool. The tip pool redistributed the tips in the following manner:

    a.  1% food and alcohol sales to bartenders;
    b.  1% food and alcohol sales to hosts;
    c.  1% food and alcohol sales to expeditors ("Expos");

30.  The Expos were not employees who "customarily and regularly" receive tips.

31.  The Expos were back of the house employees ("BOH") because they worked in the kitchen their entire shift and did not have contact with restaurant customers.

32.  The Expos primary responsibilities were to cut fresh produce, check plate presentation, add sauces and/or garnishes, tray food, wash dishes between tickets and keep the work area clean and stocked.

33.  Beginning in 2018, the front of house ("FOH") employees such as servers, bartenders, and hosts wore a Coconut Joe's embroidered polo and half aprons. The BOH employees such as fry, prep, and grill cooks and expos wore a Coconut Joe's tee shirt and full aprons.

34.  The BOH employees wore aprons. The FOH employees did not wear aprons.

35. Defendants were not entitled to reduce the minimum wage by applying the tip credit allowance that is available under 29 U.S.C § 203 (m) because Defendants enforced an illegal tip pool.

36. On March 18, 2020, in response to COVID, Coconut Joe's temporarily closed pursuant to Governor McMaster's Executive Order requiring all restaurants and bars to close dine-in services.

37. On April 23, 2020, Mr. Mackie received an email from Ms. West advising him they were in the preliminary stages of planning their reopening. She wrote, Coconut Joe's had received government assistance pursuant to the Payroll Protection Program.

38. In her text, she advised that she was extending to him an "offer" to work ten (10) hours of maintenance per week at a rate of $18.00 an hour. Furthermore, in her email she wrote "If you choose NOT to work maintenance and remain on unemployment until we fully reopen, we cannot guarantee a place on our team at that point."

39. Mr. Mackie needed his job so he returned to work.

40. At the Defendants' request, Mr. Mackie did maintenance work such as scrubbing the garbage cans and deep cleaning of the restaurant. In exchange for doing this work, the Defendants promised him he would be extended the offer of a job when the restaurant reopened.

41. Mr. Mackie is missing a paycheck for work performed May 4, 2020 to May 10, 2020, as well as his cut of the tip pool collected that week Mr. Mackie requested this pay check. Defendants responded it was mailed. To date, Mr. Mackie has not received this pay check.

42. The restaurant opened on or about May 4, 2020. Mr. Mackie who worked primarily as a server, was instructed to work as a fry cook.

43. While working his shift on May 12, 2020, Mr. Mackie started to have difficulty breathing. He told his manager Elizabeth Temple ("Ms. Temple") that he wasn't feeling well. Ms. Temple instructed him to talk to Ms. West.

44. Ms. West instructed Mr. Mackie to get back in the kitchen or he could find another job. Although he feared for his job, Mr. Mackie was concerned about his health and the health of those around him. So, he went back to Ms. Temple and told her "I feel like I can't catch my breath and I need to see my doctor". She asked him if he thought it could be COVID. He told her yes, that was his fear and he needed to see his doctor. She responded "Just be sure you get a note".

45. Before he left he told Ms. Temple, "I am not quitting my job, I do not have any intentions of quitting." He further advised her he would be in touch after he saw his doctor.

46. After he left, Ms. West sent him a text stating, "Since you left without permission, we will take that as you quitting your job here at Coconut Joe's."

47. Mr. Mackie texted Ms. West back several times that he had not quit his job and only left to seek medical treatment.

48. Mr. Mackie also texted Mr. Petro to explain that he had not quit. Mr. Petro texted back that he would discuss it with him tomorrow.

49. Mr. Mackie was a dependable employee and always showed up on time for his scheduled shifts and often picked up shifts beyond those scheduled. Throughout his employment, Plaintiff always performed his job in an above satisfactory manner.

50. On May 13, 2020, Mr. Mackie went to the doctor and was diagnosed with a panic attack. After the appointment, Mr. Mackie texted Mr. Petro a picture of the note from the doctor and told Mr. Petro he could discuss the matter anytime.

51. On May 14, 2020, Mr. Mackie again texted Mr. Petro hoping to get his job back. He told Mr. Petro he could come by the restaurant to discuss the matter. Mr. Petro responded that he could not talk because, "Too much other stuff going …" Mr. Mackie responded he could "chat" anytime and he would wait for Mr. Petro's call.

52. Mr. Mackie never heard from Mr. Petro, so on May 26, 2020 Mr. Mackie again texted Mr. Petro hoping to try and get his job back. Mr. Petro responded that he would call Mr. Mackie after 5:00 P.M. that evening. Mr. Petro did not call Mr. Mackie after 5:00 PM that evening. Nor did Mr. Petro call Mr. Mackie the next day or the day after that.

53. Several weeks went by and Mr. Mackie tried again to contact Mr. Petro to get his job back.

54. On June 21, 2020, Mr. Mackie texted Mr. Petro and inquired about his job. Mr. Petro advised Mr. Mackie that he was retiring. He said he had sold the restaurant and that it was going to remain Coconut Joe's and Ms. West would continue to work there. Mr. Petro texted they were having a party "COVID style" the following day and he invited Mr. Mackie to attend. Mr. Mackie responded there was no point to him coming to the party unless Mr. Petro was willing to give him his job back. Mr. Petro refused to give Mr. Mackie his job back.

55. Mr. Mackie's termination was in violation of FFCRA which states that it is unlawful for any employer to discharge, discipline, or in any other manner discriminate against any employee who is unable to work because of experiencing symptoms of COVID-19 and seeking a medical diagnosis.

56. Mr. Mackie engaged in protected activity under the FLSA's anti-retaliation provision when he left work to seek a medical diagnosis because he was experiencing COVID-19 symptoms.

57. The Defendants endangered Mr. Mackie's health and the health of their customers.

58. The Defendants engaged in retaliatory conduct by terminating Plaintiff, even in the face of a perceived risk to the public health.

59. Defendants actions were not in good faith or based upon a reasonable belief that they were not violating federal law.

60. Defendants actions have caused Mr. Mackie to suffer depression and anxiety.

61. Mr. Mackie is seeking emotional damages because of Defendants' retaliatory termination.

### FOR A FIRST CAUSE OF ACTION
### (FFCRA –Retaliation)
### (Individual Action)

62. Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

63. When he requested to leave work to obtain a medical diagnosis, Plaintiff had been employed for at least 30 calendar days by the Defendants.

64. Plaintiff left work to seek a medical diagnosis because he was experiencing COVID-19 symptoms.

65. Plaintiff advised Defendants why he was leaving work, despite this Defendants terminated Plaintiff.

66. The FFCRA states an employee is entitled to paid sick time to the extent that the employee is unable to work due to experiencing symptoms of COVID-19 and seeking a medical diagnosis.

67. The FFCRA states that it is unlawful for any employer to discharge, discipline, or in any other manner discriminate against any employee who takes leave in accordance with the Act.

68. An employer who willfully violates Section 5104 is also in violation of section 15(a)(3) of the Fair Labor Standards Act of 1938 (29 U.S.C. 215(a)(3)) and is subject to the penalties described in sections 16 and 17 of such Act (29 U.S.C. 216; 217) with respect to such violation.

69. The Defendants terminated Plaintiff in direct response to him leaving work to seek a medical diagnosis because he was experiencing COVID related symptoms.

70. Defendants willfully, intentionally, and unlawfully retaliated against Plaintiff because he engaged in protected conducted pursuant to FFCRA. Defendants discriminated against Plaintiff because of his protected conduct.

71. Defendants are liable for the acts of individual supervisors, managerial employees, and/or the acts of their agents.

72. Defendants are subject to individual liability pursuant to 29 U.S.C. §§203(e)(l) and 215(a)(3) for the retaliatory conduct.

73. Defendants have willfully violated the anti-retaliation provisions of the FFCRA and FLSA, which prohibit "any person" from "discharging or in any other manner discriminating against an employee because that employee has engaged in protected conduct." 29 U.S.C. § 215(a)(3).

74. The Defendants' actions of terminating Mr. Mackie for seeking a medical diagnosis were willful, and malicious.

75. Because of Defendants' willful violations of the FFCRA and FLSA, Plaintiff is entitled to recover from Defendants for front-pay, back-pay, emotional damages, reasonable attorneys' fees and costs/disbursements of prosecuting this case, plus liquidated damages, and post-judgment interest.

**FOR A SECOND CAUSE OF ACTION**
**(Fair Labor Standards Act-Minimum Wage Claim)**
**(Individual and Collective Claims)**

76. Plaintiff, on behalf of himself and all other similarly situated employees, realleges and incorporates by reference all preceding paragraphs as if specifically set forth herein.

77. At all times, pertinent to this Complaint, Coconut Joe's engaged in interstate commerce or in the production of goods for commerce as defined by 29 U.S.C. § 203(r) and 203(s).

78. At all times, relevant to this Complaint, Coconut Joe's annual gross volume of sales made or business done was not less than Five Hundred Thousand and 00/100 dollars ($500,000.00). Alternatively, Plaintiffs worked in interstate commerce to fall within the protection of the FLSA

79. The business of Coconut Joe's was and is an enterprise engaged in commerce as defined by 29 U.S.C. § 203(s)(1) and, as such, is subject to, and covered by, the Fair Labor Standards Act.

80. The FLSA, 29 U.S.C. § 206, requires employers to at least pay its non-exempt employees a minimum wage of Seven and 25/100 dollars ($7.25) an hour.

81. The FLSA mandates that Defendants compensate non-exempt employees at the minimum wage rate of $7.25 per hour.

82. The FLSA, 29 U.S.C. § 203(m), provides an exception allowing Defendants to pay less than the statutory minimum wage to tipped employees, on the condition that the tip pool consist only of those employees who customarily and regularly receive tips.

83. When the Expos, who are BOH employees, shared in the tip pool, the tip pool was invalidated.

84. Without the benefit of the tip credit provision, the Defendants must pay the Plaintiff and similarly situated employees the statutory minimum wage of seven and 25/100 ($7.25) per hour.

85. Defendants' compensation of the Plaintiff and other similarly situated employees violated the minimum wage provisions of the FLSA because Defendants did not permit Plaintiff and other similarly situated employees to retain all the tips they received.

86. Defendants' compensation of the Plaintiff and other similarly situated employees violated the minimum wage provisions of the FLSA because Defendants unlawfully retained portions of the tips received by Plaintiff and other similarly situated employees for Defendants' own profit.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all other similarly situated employees, seeks judgment against the Defendants as follows:

a. That this Court certify this action as a collective action pursuant to 29 U.S.C. § 216 (b);

b. Declaratory Judgement that the Defendants violated minimum wage provisions of the FLSA.

c. Declaratory Judgement that the Defendants violation of the FLSA were willful.

d. Court Order requiring Defendants to preserve employment records, including payroll and time records during the pendency of this action.

e. Injunctive relief requiring the Defendants to reinstate Plaintiff to his previous position;

f.  Judgment against Defendants for unlawfully retained portions of the tips they received from Plaintiff;

g.  An award of compensatory damages in an amount equal to the unpaid minimum wages owed to Plaintiff and similarly situated employees pursuant to 29 U.S.C. § 216(b);

h.  An award of liquidated damages in an amount equal to the award of compensatory damages pursuant to 29 U.S.C. § 216(b);

i.  Judgment against Defendants for unpaid wages pursuant to SCPWA owed to Plaintiff;

j.  Declaratory Judgment against Defendants that Plaintiff's termination was retaliatory and violated the FLSA and FFRCA;

k.  Judgment against the Defendants for emotional and compensatory damages resulting from his retaliatory termination;

l.  Declaratory Judgment against Defendants that their violation of the FLSA and its implementing regulations were willful;

m.  An award of the reasonable attorneys' fees and costs incurred by Plaintiff and similarly situated employees in bringing this action; and

n.  All such further relief as the Court deems just and equitable.

## JURY DEMANDED

Plaintiff Mackie, individually and on behalf of all other similarly situated employees hereby demand a trial by jury.

Respectfully submitted,

s/ Marybeth Mullaney
Marybeth Mullaney (Fed. ID No. 11162)
Mullaney Law
652 Rutledge Ave, Suite A
Charleston, South Carolina 29403
Phone (843) 588-5587

13

marybeth@mullaneylaw.net
*Attorney for Plaintiff*

July 8, 2020
Charleston, South Carolina.