# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | |
|---|---|
| JUSTIN MACKIE, *individually and on behalf of all others similarly situated*,[1]<br><br>Plaintiff,<br><br>vs.<br><br>COCONUT JOE'S IOP LLC,[2] CJ OFFERING LLC, and JOE PETRO and CAITLIN WEST, *individually*,<br><br>Defendants. | No. 2:20-cv-02562-DCN<br><br>**ORDER** |

The following matter is before the court on defendants CJ Offering LLC ("CJ Offering"), Joe Petro ("Petro"), and Caitlin West's ("West") (collectively, "defendants") motion for summary judgment, ECF No. 36. For the reasons set forth below, the court grants in part and denies in part the motion.

## I.  BACKGROUND

This case arises out of an employment dispute between a restaurant employee, Mackie; the restaurant that employed him, defendant CJ Offering LLC ("Coconut Joe's"); Coconut Joe's former owner, Petro; and its general manager, West. In 2004, Mackie was hired as a server at Coconut Joe's, a restaurant on the Isle of Palms, South Carolina. Mackie's employment was somewhat erratic; on at least two occasions, Mackie abandoned his job and quit before eventually asking to be rehired. Both times,

---

[1] At the hearing, plaintiff Justin Mackie ("Mackie") acknowledged that he never moved to certify the class, and therefore, he is proceeding individually as the only plaintiff.

[2] Defendant Coconut Joe's IOP LLC was voluntarily dismissed by stipulation on August 27, 2020. ECF No. 16.

Mackie was rehired by Petro, Coconut Joe's former owner and general manager. Throughout his employment, Mackie worked several jobs and even attempted a managerial role, although he eventually stepped down from that position. ECF No. 36-6, Mackie Dep. at 218:9–22.

By all accounts, Mackie shared a close relationship with, Petro. Petro owned and operated the restaurant for over twenty-three years before he retired as general manager in January 2020 and sold the restaurant in June 2020. After his retirement, Petro's daughter, West, took over as general manager. According to defendants, Mackie and West had a sour relationship due to "West's jealousy," as "Petro supported [Mackie] over his daughter and reversed many of the decisions she made about [Mackie]'s employment." ECF No. 36-1 at 3. Petro served as general manager at the beginning of the period in which Mackie alleges Coconut Joe's violated minimum wage laws. West was the general manager when Mackie's employment ended.

Coconut Joe's paid Mackie and the other servers $4.00 an hour. Additionally, the servers were required to contribute 3% of their tips into a tip pool, up to a maximum of $50.00 per day. Coconut Joe's management team would then distribute the tip pool among bartenders, hosts, and expeditors/server assistants, with each receiving 1% from the 3% taken from the servers. The expeditor—also known as an "expo"—was responsible for putting garnishes and sauces on plates, making nachos and salads, and ensuring that the right plates were on the correct tray.[3] ECF No. 44 at 5. The position

---

[3] Defendants claim that expos ensured that guests' plates are properly dressed and delivered to the table in a timely manner. This included running food to the table, if necessary. ECF No. 36-1 at 4. The court addresses the competing facts about the expo responsibilities in more detail in its discussion.

was filled by a "team approach." ECF No. 36-1 at 4. All servers and bartenders were required to serve at least one shift per week as an expo or host. ECF No. 44 at 5. Despite this stated approach, at least one Coconut Joe's employee claimed to have worked exclusively as an expo during a summer season. Moreover, while Coconut Joe's pays its servers and bartenders $4.00 an hour, those same employees are paid between $8.00 to $12.00 per hour when serving as an expo.

Like many other restaurants, Coconut Joe's temporarily closed on March 18, 2020 in response to the COVID-19 pandemic. As the restaurant began to reopen its dining services in May 2020, West held a staff meeting in which she told employees that Coconut Joe's would not take any adverse employment actions against employees who elected not to be placed on the work schedule. In connection with its reopening during the pandemic, Coconut Joe's decided to take strong safety and health precautions. It required all employees to take a temperature check before starting their work shifts and to sign an attestation that they were not experiencing any COVID-19 symptoms. That attestation stated:

> I attest that I'm in good health. I understand that if any time during my shift I begin to feel unwell, I should notify a manager immediately and leave the premises. I understand that failing to notify an employer of any exposure or possible illness is grounds for termination.

ECF No. 44-9. Shortly after the May staff meeting, Mackie agreed to work at the restaurant when it opened for dine-in services.

On May 11, 2021—the day before the dining room was scheduled to open— Mackie learned that his brother, with whom he was living, was "desperately ill with all of the symptoms [of COVID]." ECF No. 47-5, Mackie Dep. at 116:4–8. Mackie notified West about his brother's symptoms, and West asked how Mackie felt. When Mackie said

3

he felt "okay," West allegedly told him to go to work.  Later,[4] Mackie relayed that his brother's symptoms had worsened, but West allegedly told Mackie, "Don't worry about it.  Just go ahead and sign the sheet."  Id. at 116:14–18.  Mackie testified that on May 12, he arrived to work at 10:30 a.m. and initially felt no symptoms.  Despite this, Mackie allegedly approached West on three separate occasions before the restaurant opened to attempt to speak to her about his brother's symptoms.  Each time, West allegedly rebuffed him, ordering him to go back to the kitchen.  Then, within an hour of the restaurant opening, Mackie began to feel that he could not catch his breath.  He attempted to speak to West again, but she cut him off, stating that she was busy, and things were extremely hectic.  As a result, Mackie decided to approach who he believed to be the next person in the chain-of-command:  Elizabeth Temple ("Temple"), an off-shift restaurant manager.  Mackie testified that he told Temple that "I was short of breath and that I was afraid that I -- it was COVID symptom [sic].  I was afraid that I had it and needed to get diagnosis [sic]."  Id. at 52:1–4.  Temple told Mackie to "bring a doctors [sic] note back," which Mackie "read as permission" to leave.  ECF No. 36-7, Mackie Dep. at 281:21–24.

Mackie left work and went home.  At home, he left a message for his doctor describing his symptoms and his "perceived need to get tested."  ECF No. 36-3, Mackie Dep. at 53:16–18.  After an hour, his doctor called back and diagnosed Mackie with an anxiety attack.  Upon receiving the diagnosis, Mackie chose not to return to work.

---

[4] Mackie was not entirely sure about the timing of these conversations, Mackie Dep. at 116:14–15, 117:1–4, and the parties do not clarify it in their briefs.  Therefore, the timeline of the conversations vis-à-vis the May 12 workday is described as best as the court can construe it.

Mackie ultimately received a physician's note that recommended Mackie be excused from work for one week, which he provided to defendants.

Upon learning that Mackie had abandoned his shift, West sent Mackie a text message that read, "Since you left without permission, we will take that as you quitting your job here at Coconut Joe's." ECF No. 36-1 at 8 (citing ECF No. 1, Compl. ¶ 46). Mackie responded several times that he had not intended to quit his job. Ultimately, West did not permit Mackie to continue working at Coconut Joe's.

On July 9, 2020, Mackie filed a complaint against defendants in this court, alleging (1) retaliation under the Families First Coronavirus Response Act ("FFCRA") and (2) violation of the Fair Labor Standards Act ("FLSA").

On August 2, 2021, defendants filed their motion for summary judgment. ECF No. 36. Mackie filed a response on September 1, 2021, ECF No. 40, but subsequently moved to strike it with leave to re-file, ECF No. 41. Mackie filed an amended response to the motion for summary judgment on September 7, 2021, ECF No. 44, and defendants replied on September 14, 2021, ECF No. 49. After his response, but before defendants' reply, Mackie filed additional exhibits in support of his response on September 8, 2021. ECF No. 47. On September 14, 2021, defendants filed a motion to strike, exclude, or otherwise decline to consider those filings due to their untimeliness. ECF No. 48. Mackie responded to defendants' motion to strike on September 27. ECF No. 50. Defendants did not file a reply in support of their motion, and the time to do so has now expired. The court held a telephonic hearing on the motion for summary judgment on October 13, 2021. ECF No. 51. As such, all motions have been fully briefed and are now ripe for review.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

## III.  DISCUSSION

As a preliminary matter, the court first addresses defendants' motion to strike, exclude, or otherwise decline to consider the additional attachments filed on September 8 because the determination of which exhibits the court may consider could impact whether summary judgment is appropriate.  Finding that it may properly consider the exhibits, the court then addresses the substance of defendants' motion for summary judgment.

### A.  Motion to Strike, Consider, or Otherwise Not Consider

Mackie's deadline to file a response in opposition to defendants' motion for summary judgment was September 7, 2021.  Defendants argue that the additional attachments filed by Mackie on September 8 are untimely, and the court ought to strike, exclude, or otherwise decline to consider them.  Federal Rule of Civil Procedure 16(f)(1)(C) provides that "[o]n motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)–(vii), if a party or its attorney . . . fails to obey a scheduling or other pretrial order."[5]  Defendants argue that the untimely filings are particularly egregious because the court previously provided Mackie with two extensions to file a response.  ECF Nos. 39, 43.

In response, Mackie contends that his counsel only received the defendants' transcript a short time before the deadline, and therefore, there was no time to organize the exhibits.  Mackie also contends that defendants' counsel indicated they would consent to another extension.  However, Mackie never filed a request for such an extension of time.

The court recognizes the propriety of defendants' arguments.  However, in its discretion, the court will not sanction Mackie for the delay.  The court observes that the one-day delay for the exhibits did not change the substance of Mackie's response.  Mackie's exhibits did not appear to be correctly appended to his original response.  See

---

[5] Mackie argues that this motion should be guided by Rule 12(f)'s motion to strike.  The court disagrees.  That rule is typically used by a party to challenge defects or improper material in the pleadings at the outset of litigation; for example, if a pleading contains material that is clearly redundant or likely to cause confusion or unfair prejudice.  See, e.g., Laferte v. Murphy Painters, Inc., 2017 WL 2537259, at *1 (S.D. Fla. June 12, 2017); Burford v. Yellen, 246 F. Supp. 3d 161, 181–82 (D.D.C. Mar. 31, 2017).

ECF No. 44.  The additional attachments, see generally ECF No. 47-1, inter alia, seem to

generally follow the exhibit numbering in the original response brief.  Defendants

therefore had notice of the exhibits that Mackie intended to rely upon in the response, and

any prejudice is minimal.  Therefore, the court will not strike or exclude the attachments

to the extent that Mackie relies upon them in his response brief, but will only consider

Mackie's original memorandum of law, ECF No. 44, rather than the one filed alongside

the new exhibits, ECF No. 47.

Having decided the exhibits are properly before the court, the court will address

defendants' summary judgment motion.  Defendants request that the court grant summary

judgment in their favor on Mackie's claims for (1) violation of the FLSA and (2)

retaliation under the FFCRA.

### B.  Violation of the FLSA

Defendants argue that they are entitled to summary judgment on Mackie's FLSA

claim on three grounds.  First, they argue that no reasonable jury could find that Coconut

Joe's required Mackie to participate in an invalid tip pool that included ineligible

employees.  Second, defendants argue that Mackie's claim is subject to a two-year statute

of limitations.  Third, they argue that Mackie is not entitled to collect liquidated damages.

The court addresses each argument in turn.

### 1.  Whether the Tip Pool Violated the FLSA

Mackie's complaint asserts a claim under FLSA based on a violation of the

FLSA's tip credit provisions.  "The FLSA is best understood as the minimum

wage/maximum hour law," Trejo v. Ryman Hosp. Props., Inc., 795 F.3d 442, 446 (4th

Cir. 2015) (internal quotations omitted), intended "to protect the rights of those who toil,

of those who sacrifice a full measure of their freedom and talents to the use and profit of others," Purdham v. Fairfax Cnty. Sch. Bd., 637 F.3d 421, 427 (4th Cir. 2011) (quoting Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 597 (1944)). Accordingly, "[t]he FLSA should be broadly interpreted and applied to effectuate its goals." Purdham, 637 F.3d at 427 (citation omitted).

The FLSA currently requires that all employers pay employees a minimum wage of $7.25 an hour. 29 U.S.C. § 206(a)(1)(C). Recognizing that many employees earn a significant portion of their income through tips, the FLSA allows employers to take a "tip credit" against the minimum wage requirement for tipped employees. 29 U.S.C. § 203(m)(2)(A). In other words, an employer may use an employee's tips to satisfy the minimum wage requirement, provided that certain conditions are satisfied, set out in the statute:

> The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The [tip credit] shall not apply with respect to any tipped employee unless [1] such employee has been informed by the employer of the provisions of this subsection, and [2] all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

29 U.S.C. § 203(m)(2)(A). An employer's failure to satisfy either condition disqualifies it from claiming the tip credit to satisfy the requirement that it pay its employees a minimum wage. Because Mackie does not allege that Coconut Joe's failed to inform its employees about the tip credit, the only condition at issue is that an employee must retain all the tips that he or she receives.

The statute provides an exception to the requirement that an employee must retain all tips by permitting an employer to "pool" the tips of its tipped employees and distribute them among tipped employees. Id. However, tip pooling arrangements are only valid

9

where they include only employees who "customarily and regularly receive tips." Id.  If employees who are not considered tipped employees participate in an employer-sponsored tip pool, the employer loses the tip credit and thus cannot use his employees' tips to satisfy the requirement that they receive a minimum wage.  Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 240 (2d Cir. 2011).  However, where all tipped servers are paid at least minimum wage, tip pooling arrangements that include both tipped and non-tipped employees will be upheld because the rule only "creates rights and obligations for employers attempting to use tips as a credit against the minimum wage." Trejo, 795 F.3d at 448.

To determine whether an employee is deemed to receive tips customarily or regularly, the court must "analyze the employee's job duties, rather than the employee's job description." Wai Man Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1040 (4th Cir. 2020).  In this inquiry, the court looks to "whether the employee 'has more than de minimis interaction with the customers.'"  Id. (quoting Montano v. Montrose Rest. Assocs., Inc., 800 F.3d 186, 192 (5th Cir. 2015)) (cleaned up).

Here, Mackie claims that Coconut Joe's tip-pooling policy violates § 203(m) of the FLSA because expo workers share in the tip pool.  It is undisputed that Coconut Joe's paid Mackie and other servers $4.00 per hour and required them to contribute 3% of their tips toward a tip pool that was distributed to other employees.  As such, Coconut Joe's uses a tip credit to pay the servers the statutory minimum, but—due to the tip pool— employees do not keep all their tips.  Therefore, § 203(m)(2)(A) applies, and Coconut Joe's tip pool must only include employees who customarily and regularly receive tips. For the same reason, defendants are correct when they contend that "[t]he narrow issue in

this case is whether the tip pool was tainted by the inclusion of an employee working an expeditor shift." ECF No. 49 at 5. In other words, the relevant inquiry is whether expos are tipped employees for purposes of § 203(m).

To determine whether the tip pool participants customarily and regularly receive tips, defendants argue that the court need not conduct an inquiry into the job duties performed by Coconut Joe's employees because servers and bartenders participating in the tip pool "undisputedly receive 'over $30 a month in direct customer tips'" and therefore, "they are tipped employees under the FLSA" such that "characterization of their job duties is irrelevant." ECF No. 36-1 at 14 (quoting Manning v. St. Petersburg Kennel Club, Inc., 2015 WL 477364, at *3 (M.D. Fla. Feb. 5, 2015)). The court has not identified any authorities within the Fourth Circuit either confirming or denying this principle. In any case, defendants' reliance on Manning is misplaced. There, the court was confronted with the issue of whether cashiers were improperly included in a tip pool. The Manning court found that since the cashiers at the defendant's restaurant customarily and regularly received more than $30 a month in tips, they were "tipped employees" under the FLSA's statutory definition, and inquiry into the cashiers' job duties was irrelevant. Manning, 2015 WL 477364, at *3. Here, the court must determine whether expos are improperly included in the tip pool, meaning defendants believe that expos are comparable to the cashiers in Manning. To demonstrate this, defendants argue that servers and bartenders fill the position of expos, and servers and bartenders make more than $30 a month in tips. But this is not the same as proving that an employee makes $30 or more a month in tips while working as an expo. "[T]he fact that an employee 'is part of a group which has a record of receiving more than $30 a month in tips' does not

qualify him as a tipped employee." Barrick v. PNGI Charles Town Gaming, LLC, 2019 WL 1567900, at *5 (N.D. W. Va. Feb. 22, 2019) (quoting 29 C.F.R. § 531.56(c)). And, as Mackie points out, the Department of Labor's federal regulations recognize that an employee may be engaged in dual jobs but may only be a tipped employee with respect to one position. ECF No. 44 at 13 (citing 29 C.F.R. § 531.56(e)(1)). Defendants insist that this rule only applies to determine whether an employer may take a tip credit from an employee, ECF No. 49 at 5, but defendants ignore that the case on which they rely, Manning, sought to analyze whether the employees in the tip pool were tipped employees by statutory definition too. By statute, an employee may work in both a tipped and non-tipped occupation. It is undisputed that employees at Coconut Joe's did not earn more than $30 a month tips when they served as expos, which means that expos were not tipped employees as a matter of law. See Barrick, 2019 WL 1567900, at *6 (applying 29 C.F.R. § 531.57 to analysis of allegedly invalid tip pool). Defendants further argue that expo duties fall under Coconut Joe's employees' responsibilities as servers and bartenders and was not an independent position. However, Mackie has presented a genuine dispute of material fact on whether Coconut Joe's considered the expo an independent position by presenting deposition testimony that at least one employee exclusively served as an expo through an entire summer. ECF No. 44 at 12 n.12 (citing ECF No. 44-2, West Dep. 141:16–24). Indeed, defendants concede that they compensate servers and bartenders differently when they work an expo shift. ECF No. 36-1 at 4. Therefore, a jury must determine whether the expos are tipped employees by looking to their job duties.

The court finds the Fourth Circuit decision in <u>Wai Man Tom</u> to be instructive on this issue. There, the district court previously determined that an employee—a "Kitchen Closing Supervisor who also sometimes served as an Expediter"—was a valid tip pool participant because he had more than de minimis interaction with the customers." <u>Wai Man Tom</u>, 980 F.3d at 1041 (internal quotation marks omitted). The record contained evidence that the employee "frequently served guests," "interacted with customers in the dining room[,] and ran food to tables as an Expediter." <u>Id.</u> Notwithstanding this evidence, the Fourth Circuit reversed the district court's decision, finding that the district court merely acknowledged, but did not consider the plaintiff's evidence that the kitchen closing supervisor "primarily worked in the kitchen, rarely interacted with customers and had only de minimis interactions with customers." <u>Id.</u>

Similarly, here, a reasonable juror could find that expos were not front-of-the-house employees, as defendants suggest, based on the conflicting evidence before the court. To be sure, if the court viewed defendants' evidence in isolation, it may have found that expos had more than a de minimis interaction with guests. For example, defendants have presented evidence that expos run food to the table approximately thirty to forty percent of the time to ensure that hot plates did not sit too long in the kitchen. <u>Id.</u> (citing ECF No. 36-16 ¶ 3).[6] However, following the Fourth Circuit's instruction in <u>Wai Man Tom</u>, the court cannot limit itself to evidence from one side of the equation. Mackie

---

[6] Defendants further argue that Mackie agreed his "number-one priority as an expo was to get the food to the guests, and he enjoyed spending time in the front of the house with the diners." ECF No. 36-1 (citing ECF No. 36-5, Mackie Dep. at 67:11–20). However, having read the excerpt, the court does not agree that Mackie was describing his role as an expo. The questions immediately preceding the cited portion were centered on Mackie's role as a server and whether he shirked those duties when an expo was not around.

cites evidence that the expo was a kitchen position in which employees did not have contact with customers.  ECF No. 44 at 4 (citing ECF No. 47-5, Mackie Dep. at 104:8–15) ("It was against the rules for an expo to run food . . . . The rule [is] that [the] expo doesn't leave the kitchen.").  This account was corroborated by testimony beyond Mackie's own deposition testimony.  For example, a former server at Coconut Joe's testified that when she worked as an expeditor, she "was required to remain in the kitchen" or face "verbal reprimand[]."  ECF No. 47-6, Winters Decl. ¶ 9.  Another former server testified that her role was to "tray the food" and then "ring a bell for a server to take the food."  ECF No. 47-8, Davenport Decl. ¶ 8.  As such, she "was required to remain in the kitchen at the expeditor station during the shift."  Id. ¶ 10.  Testimony that an employee primarily worked in the kitchen when serving as an expo is sufficient evidence of merely a de minimis interaction with customers to survive summary judgment.  See Wai Man Tom, 980 F.3d at 1041; accord Montano, 800 F.3d at 194 (finding "coffeeman" who carried large trays to the dining room about once per week but spent most of his time in the kitchen making coffee did not customarily and regularly receive tips).  The legal determination of whether the expos are the type of employees who "regularly and customarily receive tips" hinges on genuine issues of material fact, and summary judgment is therefore inappropriate.

### 2.  Statute of Limitations

In the alternative, defendants argue that they are entitled to summary judgment because a two-year statute of limitations applies, and Mackie is thus not entitled to collect on allegedly unpaid wages from before that period.

An action arising under the FLSA is barred unless it is "commenced within two years after the cause of action accrued." 29 U.S.C. § 255(a). However, "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." Id. Since a FLSA claim is an action for unpaid wages, the statute of limitations determines the start date for when compensation is owed. C.f. Ray v. Bon Secours—St. Francis Xavier Hosp., Inc., 2012 WL 4591922, at *2 n.2 (applying the statute of limitations to determine the "start date for overtime compensation owed").

To establish willfulness, and thus be entitled to a three-year statute of limitations, the plaintiff must prove "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited" by the FLSA. McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). At the hearing, Mackie conceded that he had failed to meet the burden of establishing willfulness as a matter of law, and the court does not find otherwise. Therefore, the court need not consider the issue any further and grants defendants' motion for summary judgment on Mackie's statute of limitations claim. As such, to the extent that Mackie ultimately succeeds on his FLSA claim, he will be entitled to two years of damages preceding the date of his complaint, rather than three.

### 3. Liquidated Damages

Finally, defendants argue they are entitled to summary judgment on Mackie's claim for liquidated damages. The FLSA provides, in relevant part, that an employer "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The FLSA plainly envisions that liquidated damages are the norm for violations of § 207. Mayhew v.

Wells, 125 F.3d 216, 220 (4th Cir. 1997); see also Walton v. United Consumers Club, Inc., 786 F.2d 303, 310 (7th Cir. 1986).

Only where the employer shows to the satisfaction of the court that its actions were in good faith and that it had reasonable grounds for believing it did not violate the FLSA may the court exercise discretion to deny liquidated damages. Mayhew, 125 F.3d at 220 (citing 29 U.S.C. § 260) (other citations omitted); Richard v. Marriott Corp., 549 F.2d 303, 305–06 (4th Cir. 1977), cert. denied, 433 U.S. 915 (1977). The employer has a "plain and substantial burden" to persuade the court that the "failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." Mayhew, 125 F.3d at 220 (quoting Brinkley–Obu v. Hughes Training, Inc., 36 F.3d 336, 357 (4th Cir. 1994)); Richard, 549 F.2d at 306.

Mackie argues that defendants have failed to prove that their actions were in good faith and reasonable. In doing so, he paints with a broad brush—mainly stating that Petro had "years of experience in the food and beverage industry[ and] should have known that employees who work in the kitchen are not entitled to tips." ECF No. 44 at 19. But the burden here is on the defendants, and they fail to meet their burden of showing both good faith and reasonableness. They argue that after Petro learned of litigation against Hyman's Seafood Restaurant in 2016 arising out of an allegedly invalid tip pool, he "acted quickly" and "proactively researched all his pay practices, include [sic] the tip out" to ensure compliance with the FLSA. ECF No. 36-1 at 18. However, the fact that it took a publicized lawsuit against another local restaurant to spur a 23-year veteran of the restaurant industry into action belies rather than supports defendants' assertion of good

faith.  Indeed, this fact suggests that defendants took little to no action to ensure their tipping pool policy was legal before 2016, and defendants provide no evidence to the contrary.  Additionally, defendants have not offered any deposition testimony or affidavits evincing any efforts since 2016 to comply with the requirements of the FLSA. This includes deposition testimony or affidavits that the new general manager, West, has done so.

Because this court is not satisfied that defendants have clearly shown their actions were in good faith and that they had reasonable grounds for believing their actions were not a violation of the FLSA, the court denies defendants' motion for summary judgment on liquidated damages as a potential remedy.

### C.  FFCRA Claim

Next, Mackie claims that Coconut Joe's improperly retaliated against him for exercising his right under the FFCRA.  In March 2020, Congress passed the FFCRA, "which, broadly speaking, entitles employees who are unable to work due to COVID-19's myriad effects to federally subsidized paid leave."  New York v. U.S. Dep't of Labor, 477 F. Supp. 3d 1, 4 (S.D.N.Y. 2020).  The FFCRA prohibits retaliation by employers against employees that took leave under the FFCRA or filed any complaint or instituted any proceeding under the statute.  Carter v. GardaWorld Sec. Servs., 2021 WL 2018636, at *4 (D. Md. May 20, 2021).  As both sides fairly point out, the established caselaw on the FFCRA is scant.  See also Colombe v. SGN, Inc., 2021 WL 1198304, at *3 (E.D. Ky. Mar. 29, 2021) ("The FFCRA's recent enactment means there is scant caselaw interpreting the possible issues arising from the statute or the regulations.").  Mackie suggests that the court can apply the same framework for analyzing retaliation claims

under the FLSA to a FFCRA retaliation claim.  Defendants offer no contradicting

authority, and the court agrees with Mackie.  See also Kofler v. Sayde Steeves Cleaning

Serv., Inc., 2020 WL 5016902, at *2 (M.D. Fla. Aug. 25, 2020) ("Although the FLSA

and FFCRA are different statutes, retaliation for asserting rights under the FFCRA

violates the FLSA."); Colombe, 2021 WL 1198304, at *3 ("[The FFCRA] makes willful

violation of Section 5104 equivalent to a violation of section 15(a)(3) of the Fair Labor

Standards Act . . .").  Therefore, the court will apply the FLSA approach.

      In turn, the FLSA framework for analyzing retaliation claims accords with the

same framework used in Title VII cases.  Darveau v. Detecon, Inc., 515 F.3d 334, 342

(4th Cir. 2008).  "[T]o prevail on a claim of retaliation, a plaintiff must either offer

sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting

method."  Rhoads v. FDIC, 257 F.3d 373, 391 (4th Cir. 2001).  Mackie elected to pursue

a retaliation claim via application of the McDonnell Douglas burden-shifting framework.

See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this framework,

the plaintiff must first make a prima facie showing of retaliation by proving that:  (1) he

engaged in a protected activity; (2) his employer took a materially adverse action against

him; and (3) there was a causal link between the two events.  Perkins v. Int'l Paper Co.,

936 F.3d 196, 213 (4th Cir. 2019).  In order to establish a causal connection between the

protected activity and the alleged retaliation, the plaintiff must establish that the

decisionmaker had knowledge that he engaged in the protected activity and retaliated

against him because of his engagement in that protected activity.  Holland v. Washington

Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007).  If the plaintiff establishes a prima facie

case of retaliation, the burden shifts to the defendant to rebut the presumption of

retaliation by articulating a non-retaliatory reason for its action.  Id.  If the defendant

rebuts the presumption, the plaintiff then bears the ultimate burden of proving that the

proffered reason is pretext for the unlawful retaliation.  Id.  The court analyzes each step

of the tripartite test in turn.

### 1. Prima Facie Showing of Retaliation

### a. Protected Activity

The first element for establishing a prima facie case of retaliation is engagement

in a protected activity.  Although the parties do not so specify, the relevant portion of the

FFCRA in dispute here guarantees a right to leave under the Emergency Paid Sick Leave

Act ("EPSLA").  That provision provides, in relevant part:

> (1) An Employer shall provide to each of its Employees Paid Sick Leave to
> the extent that Employee is unable to work due to any of the following
> reasons:
>
> (i) The Employee is subject to a Federal, State, or local quarantine or
> isolation order related to COVID–19;
> (ii) The Employee has been advised by a health care provider to self-
> quarantine due to concerns related to COVID–19;
> (iii) The Employee is experiencing symptoms of COVID–19 and
> seeking medical diagnosis from a health care provider

29 C.F.R. § 826.20(a)(1).[7]  In other words, to prove retaliation under the FFCRA, the

plaintiff must first demonstrate that he qualified for leave under the EPSLA.  Toro v.

Acme Barricades, L.C., 2021 WL 3207632, at *6 (M.D. Fla. Apr. 9, 2021).

Mackie claims that he "engaged in protected activity according to FFCRA by

complaining that he was unwell and that he was leaving work to seek medical treatment."

ECF No. 44 at 23.  Since defendants chose not to engage in the McDonnell framework,

---

[7] Both parties cite the Public Law, Pub. L. No. 116-127, 134 Stat. 178, but the
statute is codified as 29 C.F.R. § 826.

they do not respond to this argument.  The only responsive point that can be gleaned from defendants' summary judgment briefings is their contention that Mackie "abandoned his job, not because he was experiencing COVID-19 symptoms, but rather because he was unhappy that he was assigned the job of an expo instead of a fry cook."  ECF No. 36-1 at 18.  Defendants further aver that on the day Mackie left the job, he had his temperature checked and confirmed in writing that he was not experiencing any COVID-19 symptoms that day.  Id.

However, the evidence viewed in the light most favorable to Mackie shows that he believed he could have been experiencing COVID-19 symptoms.  He testified that he began experiencing COVID symptoms about an hour after the restaurant opened.  Even if he signaled that he was not experiencing COVID symptoms that morning, it is possible that he believed that he developed those symptoms later.  Section 826.20(a)(1)(iii) protects employees who are experiencing symptoms; it does not merely protect an employee if they are, in fact, sick with COVID-19.  The court also recognizes that in May 2020, many individuals had a hyperawareness of potential COVID-19 symptoms.  Coupled with a lack of available, widespread testing, the court finds it reasonable that one would wish to seek a diagnosis, even as a precaution.

Mackie has also established, for purposes of summary judgment, that he left to seek medical diagnosis from a health care provider.  Defendants take issue with the fact that Mackie went home rather than to a doctor's office, ECF No. 36-1 at 7; however, Mackie immediately left a message for his doctor in which he expressed that he thought he needed to get tested.  The fact that his doctor later diagnosed him with an anxiety attack is not germane to the conclusion that Mackie exercised his protected right to take

20

leave and seek a diagnosis.  The court finds that a genuine dispute of material fact exists

as to whether Mackie was qualified for leave under EPSLA for that hour-long period

while he was waiting for his doctor's diagnosis.  Therefore, summary judgment is not

warranted on the issue of whether Mackie engaged in a protected activity.

### b.  Materially Adverse Action

Mackie argues that he "suffered an adverse action" after "he was terminated

within minutes of notifying his manager that he was engaging in a protected activity."

ECF No. 44 at 23.  Once again, defendants do not directly respond.  In any event,

termination is generally considered a materially adverse action for purposes of retaliation

claims.  See Emani v. Bolden, 241 F. Supp. 3d 673, 684 (E.D. Va. 2017) (analyzing

whether placement on a "PIP" list ultimately led to termination, which would constitute a

materially adverse action).  Therefore, Mackie's FFCRA claim does not fail as a matter

of law at this element.

### c.  Causation

Finally, Mackie argues that "there is a causal link between Plaintiff's protected

conduct and his termination based upon the temporal proximity, as well as Plaintiff's

tEx.t [sic] messages between himself and Ms. West."  ECF No. 44 at 23 (citing ECF No.

44-5).  "[F]or purposes of establishing a prima facie case, close temporal proximity

between activity protected by the statute and an adverse employment action may suffice

to demonstrate causation."  Waag v. Sotera Def. Sols., Inc., 857 F.3d 179, 192 (4th Cir.

2017) (citing Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004)).  The evidence

proffered by Mackie indicates that West immediately fired him once she realized he was

no longer at the restaurant.  While close temporal proximity alone is not enough to "carry

[the] burden at the pretext stage," where a plaintiff must show "that retaliation was a but-for cause of h[is] termination," it is sufficient to demonstrate causation as an element of Mackie's prima facie case. Cole v. Fam. Dollar Stores of Md., Inc., 811 F. App'x 168, 174 (4th Cir. 2020) (internal quotation marks and citation omitted).

Even so, defendants argue that Mackie was ultimately diagnosed with an anxiety attack and that Mackie "was showing signs of high anxiety" before he left. ECF No. 36-1 at 19. According to defendants, "[a]nxiety attacks were not an uncommon occurrence" for Mackie while working in the past, and he was always given time to take a break before he would compose himself and return to his duties. Id. Defendants therefore seem to suggest that West did not fire Mackie for leaving due to his COVID symptoms but because, at worst, West believed he was struggling with anxiety again. Even if this were a compelling argument, a reasonable juror could find that West had knowledge that Mackie engaged in a protected activity and retaliated against him because of his engagement in that protected activity. While neither party is claiming that West knew Mackie was specifically taking leave under the FFCRA, the court has already discussed how leaving because he was "experiencing symptoms of COVID–19 and seeking medical diagnosis from a health care provider" itself constituted the protected activity. See 29 C.F.R. § 826.20(a)(1)(iii). There is evidence that West and Temple were aware that he believed he was experiencing COVID-19 symptoms. And, according to Mackie, Temple knew he was seeking medical attention. Therefore, a reasonable juror could conclude that Mackie's termination was causally connected to his decision to take the leave.

### 2.  Rebuttal of Presumption

Since the court has determined that Mackie has shown a <u>prima</u> <u>facie</u> case of retaliation under the FFCRA for purposes of surviving summary judgment, defendants must rebut the presumption by articulating non-retaliatory reasons for the termination. Although defendants do not frame it as a non-retaliatory reason, defendants argue that Mackie was terminated "for cause," which, if true, would constitute a legitimate, non-retaliatory reason for his termination.

To support their claim that Mackie was fired for cause, defendants argue that Mackie "abandoned his job," and since he failed to tell anyone he was experiencing COVID-19 symptoms, West fired him.  ECF No. 36-1 at 18–19.  However, as the court has already discussed, the summary judgment record also contains evidence that he told the other manager, Temple, about his supposed COVID-19 symptoms.

Outside of the events that day, defendants assert that Mackie had previously left his job without notice on two other occasions, seemingly suggesting that this was a final strike of sorts.  <u>See</u> ECF No. 36-1 at 8.  Defendants also argue that during his tenure, Mackie "created friction with other staff members because he would constantly complain about anything he was asked to do, and his refusal to perform all the duties of his job often was shouldered by his co-workers."  <u>Id.</u> at 9.  The court finds that these reasons, if true, are legitimate, non-retaliatory reasons for Mackie's termination and warrant moving on to the final step of the inquiry.

### 3.  Pretext

Since defendants provided non-retaliatory reasons for Mackie's termination, the burden returns to Mackie to prove that the reasoning was merely pretext, and that Mackie

was, in fact, fired for taking protected leave.  A reasonable juror could conclude that firing Mackie for leaving without permission was pretextual.  First, a reasonable juror could find that firing Mackie for leaving without permission was not a genuine reason because Mackie had sought permission from West and Temple.  Moreover, a reasonable juror could find that the other reasons—those relating to prior infractions and poor behavior—were also pretextual because the only basis for termination provided to Mackie was his decision to leave without permission.  The record evidence indicates that West texted Mackie that "[s]ince you left without permission, we will take that as you quitting your job here at Coconut Joe's."  ECF No. 36-1.  Courts have previously determined that on the issue of pretext, "a jury might also find it relevant that the non-retaliatory explanation given . . . was never actually communicated" to the plaintiff.  Hill v. Nicholson, 383 F. App'x 503, 514 (6th Cir. 2010).  Defendants further concede that Mackie immediately texted West back that he had not intended to quit his job, but that text did not change her mind.  Accordingly, based on West's test message, there is a genuine issue of material fact as to whether Coconut Joe's provided Mackie a valid, non-retaliatory reason for his discharge.  To be sure, a jury may ultimately conclude that defendants had a non-retaliatory reason for terminating Mackie and the evidence is insufficient to establish that such reasons were merely pretext.  However, the court finds that Mackie's evidence of pretext is, at this stage of the proceedings, sufficient to survive summary judgment.

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART** and **DENIES IN PART** the motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 27, 2021**
**Charleston, South Carolina**